OSCODA CHAPTER OF PBB ACTION COMMITTEE, INC v
DEPARTMENT OF NATURAL RESOURCES

Docket No. 61403. Decided August 1, 1978. On application by plaintiffs for leave to appeal the Supreme Court dissolved a temporary order previously entered by it restraining burial of cattle contaminated by PBB in a clay-lined pit.

The Oscoda Chapter of PBB Action Committee, Inc., and its president, Nelson Yoder, brought an action for injunctive relief to prevent the Department of Natural Resources from burying cattle which had been contaminated with polybrominated biphenyl (PBB) in a clay-lined pit with a 20-foot clay liner on state-owned land in Oscoda County. The plaintiffs argued that the defendants had failed to obtain a garbage disposal permit required by statute, that the burial would ultimately result in pollution of ground water supplies in violation of the environmental protection act, and that incineration was a feasible alternative method of disposal. The Oscoda Circuit Court, Allan C. Miller, J., denied the plaintiffs' motion for a temporary restraining order. The Court of Appeals, Danhof, C.J., and J. H. Gillis and N. J. Kaufman, JJ., denied leave to appeal (Docket No. 78-1471). Plaintiffs applied for leave to appeal. The Supreme Court issued a temporary restraining order, remanded to the circuit court for an evidentiary hearing, and retained jurisdiction. The circuit court, on remand, recommended that the defendants should be permitted for six months to bury cattle in a pit which has been prepared. After that all the condemned cattle should be incinerated. *Held:*

The temporary restraining order previously entered by the Court is dissolved forthwith, permitting the burial of contaminated cattle in the constructed clay-lined pit, and the cause is remanded to the circuit court for appropriate further proceedings on the plaintiffs' complaint.

Justice Levin, who was joined by Chief Justice Kavanagh and Justice Coleman, wrote:

The PBB act, in providing that the Director of the Depart-

REFERENCES FOR POINTS IN HEADNOTES
[1-4, 7-10] 4 Am Jur 2d, Animals §§ 31, 32, 35.
[3-10] 39 Am Jur 2d, Health § 36.
   61 Am Jur 2d, Pollution Control §§ 101-104, 108, 146, 147.
[7, 8] 29 Am Jur 2d, Evidence §§ 127, 128.

ment of Natural Resources "shall * * * bury or dispose" of PBB-contaminated cattle, empowers him to decide whether to dispose of the cattle by burial, incineration or any other means. The only basis upon which *a court* might have authority to bar landfill disposal under the special purpose emergency legislation is the environmental protection act. The circuit judge found that the possibility of liquid escaping the clay-lined pit "is almost non-existent" and that even if it were to escape "it would be innocuous", and that the clay-lined pit provides "absolute protection". Those findings preclude a determination under the environmental protection act that it is "likely" that burial of PBB-contaminated cattle in the clay-lined pit will "pollute, impair or destroy the air, water or other natural resources or the public trust therein". Absent a likelihood of environmental pollution or impairment, the circuit court is without power to consider whether incineration is a "feasible and prudent alternative".

Justice Fitzgerald, with Justice Ryan concurring, wrote separately. The circuit court's finding that the clay-lined pit "provides absolute protection at the proposed burial site" is substantially supported by the record and is not clearly erroneous. Plaintiffs have failed to establish that the burial of the contaminated cattle in the clay-lined pit is likely to impair, pollute or destroy the environment and thus have failed to meet their burden of proof under the environmental protection act. Therefore, it is not necessary to discuss the alternative of incineration or the power of a court to order an alternative means of disposal. The circuit court did not abuse its discretion in declining to restrain defendants from burying the contaminated cattle in the clay-lined pit.

Justices Williams and Blair Moody, Jr., dissenting, would adopt the findings of fact and recommendations of the trial court in full, allowing burial in the one prepared pit for six months after which all contaminated cattle would be incinerated. The following findings of the trial court are extensively supported in the record:

1. PBB can be destroyed by incineration;

2. Noxious by-products of PBB can also be destroyed by incineration under proper conditions;

3. Incineration is the preferred method of disposal whenever available;

4. While there is no existing incinerator available, one could be developed for future use within approximately six months;

5. The rapid decay of contaminated cattle and the lack of

available freezer space are exigent circumstances requiring the temporary use of the present clay-lined pit.

Courts would be ignoring the mandate of the environmental protection act if they were to refuse to grant equitable relief or impose conditions required to protect the air, water and natural resources. The court's power to grant appropriate relief is triggered by a prima facie showing that the defendants' conduct is likely to pollute, impair or destroy the environment. The plaintiffs in the instant case have met this threshold requirement. There is no provision in the environmental protection act which gives substance to the assertion that feasible and prudent alternatives may not be considered by a court of equity unless the alleged polluter raises an affirmative defense. If the defendants could avoid the court's scrutiny of alternatives by merely failing to formally plead an affiramtive defense, the act would be effectively gutted of its intended purpose of protecting the environment. The appropriate criterion under the environmental protection act is to adopt the feasible and prudent alternative least likely to impair or pollute the environment.

In recommending that after the six-month period all contaminated cattle be incinerated, the trial court correctly recognized, in the interest of the good health of Michigan citizens, that the state should be required to adopt the feasible and prudent alternative least likely to impair or pollute the environment, *i.e.,* incineration. They would remand to the trial court for entry of an order reflecting the above recommendations, enabling jurisdiction to be retained by the trial judge to enforce and/or modify that order.

## DECISION OF THE COURT

1. HEALTH AND ENVIRONMENT — CONTAMINATED CATTLE — BURIAL — DEPARTMENT OF NATURAL RESOURCES.

The Department of Natural Resources may bury cattle contaminated with polybrominated biphenyl in an amount more than 20 parts per billion in a clay-lined pit constructed on state land. (1977 PA 77).

## OPINION BY LEVIN, J.

2. HEALTH AND ENVIRONMENT — CONTAMINATED CATTLE — DISPOSAL — DEPARTMENT OF NATURAL RESOURCES.

*The Legislature has authorized the Director of the Department of Natural Resources to decide whether to dispose of contaminated cattle whose level of polybrominated biphenyl (PBB)*

*exceeds 20 parts per billion by burial, incineration or by any other means (1977 PA 77).*

3. HEALTH AND ENVIRONMENT — CONTAMINATED CATTLE — BURIAL — ENVIRONMENTAL PROTECTION ACT.

*The polybrominated biphenyl (PBB) act provides for landfill disposal as an acceptable means of disposition of cattle whose level of PBB exceeds 20 parts per billion; therefore, the only basis upon which a court might have authority to bar landfill disposal pursuant to that special purpose emergency legislation is the environmental protection act (1977 PA 77; MCL 691.1201 et seq.; MSA 14.528[201] et seq.).*

4. HEALTH AND ENVIRONMENT — CONTAMINATED CATTLE — BURIAL — ENVIRONMENTAL PROTECTION ACT.

*There is no basis for judicial intervention in burial of cattle whose level of polybrominated biphenyl (PBB) exceeds 20 parts per billion in a pit lined with 20 feet of clay where a court found, with full support in the record, that the possibility of liquid escaping the clay-lined pit "is almost non-existent", that even if it were to escape "it would be innocuous" and that the clay-lined pit provides "absolute protection" to the environment (1977 PA 77; MCL 691.1201 et seq.; MSA 14.528[201] et seq.).*

5. HEALTH AND ENVIRONMENT — CONSTITUTIONAL LAW — ENVIRONMENTAL PROTECTION ACT.

*The Constitution confers no authority on the courts to preserve and protect the environment; it provides, rather, that the Legislature shall provide for the protection of the natural resources of the state, which it has done by enacting the environmental protection act (Const 1963, art 4, § 52; MCL 691.1021 et seq.; MSA 14.528[201] et seq.).*

6. HEALTH AND ENVIRONMENT — ENVIRONMENTAL PROTECTION ACT.

*A court is not empowered by the environmental protection act to prevent any conduct, whether originally proposed or alternative, even though the court finds some other alternative action is more desirable, which does not rise to the level of environmental risk proscribed by the act; the standard, "has, or is likely to pollute, impair or destroy", is a limitation as well as a grant of power (MCL 691.1201 et seq.; MSA 14.528[201] et seq.).*

OPINION BY FITZGERALD, J.

7. HEALTH AND ENVIRONMENT — CONTAMINATED CATTLE — BURIAL — ENVIRONMENTAL PROTECTION ACT.

*A circuit court did not abuse its discretion in declining to restrain*

*the Department of Natural Resources from burying contaminated cattle whose level of polybrominated biphenyl (PBB) exceeds 20 parts per billion in a clay-lined pit where the finding by the circuit court that the clay-lined pit "provides absolute protection" of the environment at the burial site is substantially supported by the record and is not clearly erroneous, and the plaintiffs have failed to establish their burden of proving under the environmental protection act that the burial of the contaminated cattle in the pit is likely to impair, pollute or destroy the environment (1977 PA 77; MCL 691.1203, 691.1205; MSA 14.528[203], 14.528[205]).*

8. Health and Environment — Contaminated Cattle — Burial — Alternative Disposal — Environmental Protection Act.

*Discussion of the desirability of means of disposal other than burial in a clay-lined pit of contaminated cattle whose level of polybrominated biphenyl (PBB) exceeds 20 parts per billion or of the power of the court to order an alternative means of disposal is not necessary where plaintiffs failed to meet their burden of proving under the environmental protection act that burial of cattle in the pit is likely to impair, pollute or destroy the environment (1977 PA 77; MCL 691.1203, 691.1205; MSA 14.528[203], 14.528[205]).*

Dissenting Opinion by Williams and Blair Moody, Jr., JJ.

9. Health and Environment — Contaminated Cattle — Burial — Incineration — Department of Natural Resources.

*The rapid decay of contaminated cattle and the lack of available freezer space are. exigent circumstances requiring the temporary use of the prepared clay-lined pit for burial of polybrominated biphenyl (PBB) contaminated cattle by the Department of Natural Resources for the limited period of six months, after which all contaminated cattle should be incinerated (1977 PA 77).*

10. Health and Environment — Environmental Protection Act — Incineration — Contaminated Cattle.

*The appropriate criterion under the Michigan environmental protection act for determining how to dispose of cattle contaminated with polybrominated biphenyl (PBB) is to adopt the feasible and prudent alternative least likely to impair or pollute the environment, i.e., incineration, where there is extensive support in the record that PBB and noxious by-products of PBB can be destroyed by incineration, incineration is the*

*preferred method of disposal wherever available, and a proper incinerator could be available within approximately six months (1977 PA 77; MCL 691.1205[2]; MSA 14.528[205][2]).*

*James M. Olson* and *William Rastetter* for plaintiffs.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Stewart H. Freeman* and *Don L. Keskey,* Assistants Attorney General, for defendants.

LEVIN, J. The issue before the Court is whether to grant plaintiffs' application for leave to appeal the denial of a temporary restraining order by the Oscoda County circuit judge. Specifically, plaintiffs sought to block the burial, in a pit lined with 20 feet of clay, of animals whose level of polybrominated biphenyl (hereinafter PBB) exceeded the 20 parts per billion standard provided in 1977 PA 77, the PBB act.[1]

The PBB act, in providing that the Director of the Department of Natural Resources "shall * * * bury or dispose" of PBB-contaminated cattle, empowers him to decide whether to dispose of the cattle by burial, incineration or any other means.

The circuit judge found that the possibility of liquid escaping the clay-lined pit "is almost nonexistent" and that even if it were to escape "it would be innocuous", and that the clay-lined pit provides "absolute protection".

Those findings preclude a determination under the environmental protection act[2] that it is "likely" that burial of PBB-contaminated cattle in the clay-lined pit will "pollute, impair or destroy the air, water or other natural resources or the

---

[1] 1977 PA 77; MCL 288.426; MSA 12.695(6).

[2] 1970 PA 127; MCL 691.1201 *et seq.;* MSA 14.528(201) *et seq.*

public trust therein". Absent a likelihood of environmental pollution or impairment, the circuit court is without power to consider whether incineration is a "feasible and prudent alternative".

The temporary restraining order is dissolved and the cause is remanded to the circuit court for appropriate further proceedings on plaintiffs' complaint.

I

In his findings of fact, opinion and recommendation of June 21, 1978, the circuit judge said that the "originally proposed burial pits for the PBB-contaminated cattle in the former action [commenced by the County of Oscoda against the Department of Natural Resources] were found as an ultimate fact to likely impair and pollute the water table of Oscoda County in violation of § 3(1)" of the environmental protection act.

On November 8, 1977 the Director of the DNR announced his decision to proceed with the burial of PBB-contaminated cattle by modifying the design of the originally proposed burial pit to include a 20-foot clay lining.

In April, 1978 this action was commenced to block the burial of contaminated animals in the clay-lined pit. On plaintiffs' application for leave to appeal from the circuit judge's refusal to grant a temporary restraining order, this Court granted a stay and subsequently, in lieu of leave to appeal, remanded the cause to the Oscoda County Circuit Court "for an evidentiary hearing and detailed factual findings on the issues raised by plaintiffs' complaint", but did not in terms seek recommendations.

A factual basis for the judge's finding that "[i]n-

cineration is a preferred method of disposal whenever available" is not stated. The stated basis is that a guideline issued by the Federal Environmental Protection Agency indicates that, in the order of options, incineration is less desirable than recycling and more desirable than landfill and long-term storage. That generalization is followed by a statement of reasons why incineration is not practicable at this time.[3]

---

[3] "5. No incinerator exists within the State of Michigan capable of performing the present task of incinerating PBB-contaminated cattle.

"6. That research on incineration of PBB has not resolved all of the problems connected with it.

"7. That while an incinerator is needed for disposal of toxic wastes generally, and would be desirable for the resolution of the instant problem (and while such facilities are a priority item of the Department of Natural Resources, Exhibit 46, during the current legislative term) the facilitity is not a current reality.

"a) That even after an order was placed it would take 4 months for set-up and an equivalent period of time for adequate testing before operations could proceed.

"b) That while no tests have been conducted on a commercial scale with PBB, the experience with PCB at Rollins Environmental Service, Inc., facility, Deer Park, Texas and the incineration at sea of Herbicide Orange on the M/T Vulcanus indicate that all technical problems can be overcome.

"c) Feasibility studies including specifications were actually established in October, 1977 and bid requisitions issued in December, 1977.

"d) It has been determined that an incinerator capable of attaining a temperature of 2000° F with at least a two-second retention; with adequate air induction facilities to draw emissions back into the kiln and a wet-scrubber and precipitator to eliminate escape of noxious fumes or by-products, can accomplish the destruction of PBB and noxious by-products.

"e) There is also a material handling problem which can be solved by maceration, which is used in making dog food, and a dissolver which in turn creates a liquid or slurry.

"f) The noxious by-products known as furan and dioxin would be destroyed at these temperatures.

"g) Operation of the incinerator must be carefully monitored and a training program for employees conducted.

"h) It is noted that even with the successful large scale disposal of PCB at the Rollins facility mentioned above, it was still necessary to landfill the steel drums used to transport the PCB and the solid residue from the kiln hopper. Furthermore, the scrub waters were piped to treatment ponds.

"8. There is no 'on shelf' or existing incinerator in Michigan available to the state at this time, however:

The circuit judge then stated that landfill disposition is, in the language of the environmental protection act, a "feasible and prudent alternative at the current proposed site":

"a) The amount of contamination found in each of the cows proposed for burial by the State is extremely small, averaging approximately 65.3 parts per billion and equalling approximately 3/10 of one ounce for all of the cows condemned during the period October 3, 1977 through June 6, 1978. Further, the level of contamination is expected to decrease during each succeeding year.

"b) PBB is found almost exclusively in the body fat of the contaminated animals and is not expected to be released onto the clay liner during the burial operations.

"c) PBB is characteristically an organic substance which is highly insoluble in water, but extremely soluble in body fat and organic matter.

"d) The amount of PBB found in the contaminated animals proposed for burial is generally far less than the amount of PBB permitted under Federal standards for sale to the public as meat for human consumption, which Federal standard is 300 parts per billion.

"e) PBB because it attracts strongly toward organic matter, will in all probability attract to and bind to the organic matter found in the cow carcasses, and will remain with the organic matter through various levels of organic decomposition and regeneration, resulting in the PBB molecules remaining with an organic layer of material left by the degeneration of the cow carcasses.

"f) In the event that any PBB molecule did not disintegrate or remain with the organic layer represented by the degenerated cow carcasses, it would in all probability travel in association with other organic molecules and thereby bind with the sand located

"a) Exhibits 16 and 17 indicate that a new incinerator could have been operating by April, 1978.

"b) Cost would be comparable and,

"c) Site location problems would exist as to either burial or incineration." (Citations omitted.)

around the carcasses or at the clay liner at the bottom of the pit and at those points where the organic molecules adsorb to the soil and become bound thereto.

"g) The clay utilized in the liner at the Oscoda burial site is highly impermeable with the greatest permeability being $3 \times 10^{-7}$ centimeters per second, with most samples being far less permeable. Thus, any liquid flowing from the carcasses will settle atop the clay liner for lengthy periods of time equalling many decades in the least, during which time any PBB molecule would become attached to organic matter and bound to the clay particles.

"h) The burial pit is engineered, designed, and constructed to prevent entrance of water from rain, snow melt, or other sources and to provide the water a path of least resistance around the clay burial vault.

"i) With the lack of water entering the burial vault, the maximum liquid located in the vault is represented by the liquid found in the cow carcasses themselves. Thus, due to the nature of clay to retain its moisture and because of capillary action, any animal liquid could travel no further than 9.39 feet into the clay liner where it would remain suspended indefinitely without exiting the bottom of the clay liner. The seepage of any such liquid into the clay liner would also reduce the unit head in the vault area to 0, thus eliminating any pressure to push the liquid along through the clay.

"j) The clay liner has been properly constructed to comply fully with the option provided in the court's opinion of September 29, 1977 and its order dated November 1, 1977. The source clay was obtained from the marsh pit comprising clay of the CH/CL type and was found to be highly impermeable with a maximum permeability coefficient of $3 \times 10^{-7}$.

"(i) $\times 10^{-7}$ means 1 foot per year.

"(ii) $\times 10^{-7}$ equals 200 years for the 20-foot clay liner.

"(iii) Some of the clay tested at $2.2 \times 10^{-9}$ (0.0000000022) or 10,000 years to move through the liner.

"k) The clay liner was constructed under supervision of state officials, with compaction tests establishing 95% or better compaction of each clay layer. In addition, the

clay utilized consisted of highly desirable fine grains comprising 75-90% five microns or less, far exceeding the engineering specifications.

"l) Being placed in the ground, the burial vault is designed so as to retain the clay's moisture and to eliminate any stress or stability problems that could lead to cracking of the clay.

"m) Slight cracking of the clay liner in suface areas exposed to drying is a minor problem which is not indicative of the interior bulk of the clay liner on both the sides and bottom, in view of the state supervisors' continuing diligence in insuring the quality of compaction, lack of cracking, removal of drying fluff, and removal of rain-caused slop, prior to compacting a succeeding layer. Further, surface cracking can readily be repaired by removal of the cracked surface followed by recompaction of the top 6 inches.

"n) The cows will be buried with burial sand starting from one end of the pit to the other in a manner that will reduce the chance of rainfall increasing the amount of liquid found in the pit. Further, the burial of the first pit will be speedily completed in view of the inventory of cows presently held by the state and should not comprise more than several days.

"o) The clay utilized to construct the burial pit is suited for such purpose because of its high impermeability, due to its uniform small particle size and due to moderate plasticity and liquidity parameters along with its ease of compaction.

"p) Decomposition of the carcasses will be primarily of anaerobic nature due to the lack of oxygen in the burial vault, the constant temperatures, and the lower temperatures expected in the vault located below the frost line. Decomposition of the carcasses will be slow and will not result in the buildup of gas to an amount likely to exit the clay liner. ·

"q) To the extent that any gas is produced over a long period of time, it will absorb into porous areas of the burial sand and into the clay liner itself.

"r) The floor of the burial pit is located approximately 45 feet above the groundwater table which is itself immersed in sandy and silty material.

"s) *The chance that liquid in the burial vault will exit
the 20-foot clay liner is almost non-existent, but even if
any liquid exited the clay liner, it would be innocuous
due to the clay's ability to absorb organic material and
molecules entering the clay liner.*

"t) The state committed itself to Federal Environmen-
tal Protection Agency inspectors to maintain and moni-
tor wells to test for contaminants on a routine basis and
will provide installation of any purging system neces-
sary to completely remove the existence of any contami-
nants from groundwaters located downgradient from
the burial site. These precautions are made to allay the
fears of the public and achieve Federal Environmental
Protection Agency approval.

"u) The ground water flow from the burial site is such
that it would take 1.7 to 15 years for any groundwater
to reach private property from the burial site, providing
ample time for installation of a purging system to stop
any contaminants in view of the 30-day time period
during which such a system can be installed. Also,
movement of any contaminant would be far slower (if
at all) than the flow of the groundwater.

"v) The burial site provides isolation vertically from
the groundwater table and horizontally from private
property to provide protection of the public from con-
tamination of groundwaters. Further, the site is under
management and ownership by the state guaranteeing
a minimum of surface utilization of the site and provid-
ing for regular inspection and maintenance by state
officials. The specifications of the burial vault and site
relative to vertical and horizontal isolation, quality of
the clay used, thickness of the liner, compaction, and
permeability, exceed Federal requirements for estab-
lishment of a site for disposition of hazardous or toxic
chemical materials." (Emphasis supplied.)

The judge added that 400 head of cattle had
been placed, three to a drum, in cold storage and
that the owners need the storage space for this
year's crops.

His findings continued:

"4. That the total amount of PBB on hand and proposed to be buried in Oscoda would be less than .3 ounces and the average level of PBB in these cows of 63 parts per billion would make them available for sale under Federal Environmental Protection Agency standards which allow up to 300 parts per billion. That the relative insolubility and immobility of PBB is demonstrated vividly by the fact it is known that 80 tons of raw PBB in filter cake was dumped into the groundwater system after the operator broke the clay lens in the Gratiot County landfill and that no PBB has as yet been detected in private wells off the site. Admittedly, it has been detected in wells within 800 feet of the site in the amount of 4.4 parts per billion. This should be compared with the 5 parts per billion permitted in milk under the stringent standards of [1977 PA] 77.

"5. The Federal Environmental Protection Agency guidelines recommend 10 feet of natural clay or 5 feet of compacted clay as a liner.

"6. The court-authorized 20 feet of clay based upon Michigan solid waste regulations * * *, provides absolute protection at the proposed burial site.*"

---

"* The Michigan Solid Waste Disposal regulation provides in part as follows:

" '5. Where possible, landfills should be placed in earth materials of low permeability (less than 0.2 inches per hour) such as glacial clay till or lake clay. In these materials, a continuous thickness of at least 20 feet of the material should exist between the base of the refuse and the groundwater aquifer. This thickness is needed for protection of groundwater quality.'

"Department of Natural Resources specifications and site isolation also provided for more safety than Federal guidelines. Guideline 3004 provides for 500 feet horizontal isolation and the Oscoda site provides 4000 feet. The guideline calls for 5 feet vertical isolation and the Oscoda site provides 44 feet. The grain size of the Federal guideline is plus/minus 30% passing 200 mesh, where Department of Natural Resources specified 50% and 300 mesh—again more stringent in both respects. Environmental Protection Agency guidelines specify 85-95% compaction and the Department of Natural Resources specified 95% and achieved higher."

---

In conclusion he recommended that the cattle in cold storage and condemned cattle now being held by the DNR and any other cattle condemned

within the next six months be buried in the one pit now prepared. He added that "[i]t is further recommended that after said 6 months all PBB-contaminated cattle be incinerated."[4]

## II

The PBB act provides:

"(1) The director of the department of natural resources, at state expense, shall transport, humanely destroy, and *bury or dispose of* dairy cattle described in section 3, except those that may be used for controlled research and experimentation. Disposal facilities shall be selected and provided by the director of the department of natural resources. The director of the department of natural resources shall provide for periodic monitoring of a disposal facility, not less than annually, to determine whether polybrominated biphenyl is *emanating from the facility* and contaminating surrounding land or waters. If the monitoring discloses that a *significant amount* of polybrominated biphenyl is *contaminating surrounding land or water,* the director of the department of natural resources shall take the necessary and appropriate action to prevent *further escape.*

"(2) The department of natural resources shall contract with any person or corporation for site preparation work based upon open competitive bids. The determination of site specifications shall be the responsibility of the department of natural resources." MCL 288.426; MSA 12.695(6) (emphasis supplied).

## The environmental protection act provides:

[4] The plaintiffs also argued that the defendants should be enjoined because they had not obtained a permit to dispose of the cattle as required by 1965 PA 87, MCL 325.291 *et seq.;* MSA 14.435(1) *et seq.,* which requires one who proposes to dispose of refuse to procure a license from the DNR. Assuming without deciding that defendants should have obtained such a permit, we agree with the judge that the procedures followed, including the hearing before him, satisfied this requirement.

"(1) When the plaintiff in the action has made a prima facie showing that the conduct of the defendant *has, or is likely to pollute, impair or destroy the air, water or other natural resources* or the public trust therein, the defendant may rebut the prima facie showing by the submission of evidence to the contrary. The defendant may also show, by way of an affirmative defense, that there is no feasible and prudent alternative to defendant's conduct and that such conduct is consistent with the promotion of the public health, safety and welfare in light of the state's paramount concern for the protection of its natural resources from pollution, impairment or destruction. Except as to the affirmative defense, the principles of burden of proof and weight of the evidence generally applicable in civil actions in the circuit courts shall apply to actions brought under this act." MCL 691.1203; MSA 14.528(203) (emphasis supplied).

Whether the circuit judge's findings and recommendation for incineration are characterized as a finding of fact or an expression of opinion, the courts are without power to order incineration.

While the Legislature authorized the Director of the DNR to dispose of PBB-contaminated cattle by means other than burial, he is authorized to bury. The act states that the Director of the DNR "shall * * * bury or dispose" of PBB-contaminated cattle. It speaks of "site preparation" and "disposal facilities" "selected and provided" by the director.

The term "disposal facility" is indeed broad enough to include incineration facilities. Nevertheless, the proviso that the director shall periodically monitor, not less than annually, a disposal facility to determine whether PBB is "emanating from the facility" and contaminating surrounding land or waters underscores that the Legislature contemplated landfill disposal. That conclusion is buttressed by the next sentence that if the monitoring

discloses "a *significant* amount" (emphasis supplied) of PBB is contaminating surrounding land or waters the director shall take necessary and appropriate action to prevent *"further* escape" (emphasis supplied). Landfill disposal was contemplated by the Legislature.

Since the PBB act provides for landfill disposal as an acceptable means of disposition, the only basis upon which a court might have authority to bar landfill disposal pursuant to that special purpose emergency legislation is the environmental protection act.

A court may intervene, under the environmental protection act, if the conduct of the defendant "has, or is likely to pollute, impair or destroy the air, water or other natural resources or the public trust therein".

While the circuit judge found that the originally proposed burial pit was likely to impair or pollute the water table, he found that the possibility of liquid escaping the clay-lined pit "is almost nonexistent" and that even if it were to escape "it would be innocuous", and that the clay-lined pit provides "absolute protection".

Those findings are fully supported by the record and preclude a determination that it is likely that a "significant amount" of PBB may "contaminat[e] surrounding land or water"[5] or "pollute, impair or destroy" the environment.[6] Accordingly, there is no basis for judicial intervention.

### III

It is argued that, although the act does not "specifically speak" to selecting between feasible

---

[5] MCL 288.423; MSA 12.695(3).

[6] MCL 691.1203; MSA 14.528(203).

and prudent alternatives, the paramount policy of the state to preserve and protect the environment (Const 1963, art 4, § 52) and the corresponding paramount purpose of the environmental protection act, "requires adoption of the feasible and prudent alternative *least likely* [emphasis in the original] to impair or pollute. Furthermore, rapid technological advancements require courts to use foresight when attempting to minimize adverse effects on the environment".

Const 1963, art 4, § 52, confers no authority on the courts. It provides, rather, that "[t]he legislature shall provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruction". The Legislature has done so by enacting the environmental protection act. That act does not confer plenary power on the courts to do whatever they may think preferable in environmental cases. Absent a finding that the conduct of the defendant has or is likely to pollute, impair or destroy, the court may not order another alternative even though it finds it more desirable.

When the judge found, in the former action, a likelihood of pollution or impairment of the environment, the DNR did not assert as an "affirmative defense" that it should nevertheless be permitted to bury contaminated cattle as originally planned because there was no feasible and prudent alternative to its so polluting or impairing the environment and that such conduct was consistent with the public health, safety and welfare in light of the state's paramount concern for the protection of the environment.

Since the DNR did not seek to show by way of affirmative defense that there was no feasible and prudent alternative, the court was without power

to adjudicate the question of feasible and prudent alternative. Similarly, plaintiffs' claim that incineration is a feasible and prudent alternative did not inject that question.

Moreover, if the issue of feasible and prudent alternatives is raised, the question is whether there is *a* feasible and prudent alternative or, more specifically, "*no* feasible and prudent alternative" (emphasis supplied). The court may only decide whether such an alternative exists; it may decide that there is no feasible and prudent alternative or that there is one or more such alternatives. If it decides that there is one or more, the defendant may not proceed with the project as planned; the court's work is done. It is not for it to decide which among the feasible alternatives the defendant should adopt if it wishes to proceed. Neither the Constitution nor the Legislature has granted that power to this or any other court. In PBB cases, the Legislature has specifically conferred on the Director of the DNR the choice of alternatives. Therefore, hypothesizing the existence of an operational incinerator, the choice of disposal methods would still be that of the Director of the DNR.

Assuming that a court has the power to select the feasible and prudent alternative which represents the least environmental risk, that would not justify exercise of such power where the court has found, as here, that the "alternative" chosen by the defendant is not likely to pollute or impair the environment.[7]

A court is not empowered to prevent any conduct, whether originally proposed or alternative,

---

[7] The finding of no prohibited environmental risk makes it unnecessary to decide whether lining the pit with 20 feet of clay is an "alternative".

which does not rise to the level of environmental risk proscribed by the environmental protection act. The standard, "has, or is likely to pollute, impair or destroy", is a limitation as well as a grant of power.

Pursuant to GCR 1963, 866.3(c) the clerk is directed to enter and issue forthwith this Court's order dissolving the temporary restraining order, permitting the burial of contaminated cattle in the constructed clay-lined pit, remanding the cause to the circuit court, with notice therein that, in accordance with said rule, a motion for rehearing may be filed but such filing does not stay execution or enforcement of this Court's order.

KAVANAGH, C.J., and COLEMAN, J., concurred with LEVIN, J.

FITZGERALD, J. This case has a complicated and unusual history. The defendants originally proposed to dispose of those cattle whose level of polybrominated biphenyl (hereinafter PBB) exceeded the 20 parts per billion standard provided in 1977 PA 77[1] in pits on state-owned land in Oscoda County. A lawsuit was filed by the County of Oscoda to block the proposed burial. The result of that lawsuit was a judgment by the circuit court that a permanent injunction would issue barring the proposed burial in Oscoda County unless the defendants agreed to install, in the pit where burial was imminent, a 20-foot clay liner. In November of 1977, the defendants agreed to do so and publicly announced the decision.

In April of 1978, the present plaintiffs filed a suit in Oscoda Circuit Court seeking to block the burial of the contaminated animals in the pro-

---

[1] MCL 288.421 et seq.; MSA 12.695(1) et seq.

vided clay-lined pit. The plaintiffs argued that the defendants should be enjoined because they had not acquired a permit to dispose of the cattle as required by 1965 PA 87,[2] a legislative enactment which requires one who proposes to dispose of garbage or refuse to procure a license from the Department of Natural Resources before proceeding to do so. The plaintiffs argued that the failure by the defendants to procure a license obviated the possibility of public hearings and public input into the decision in question. In addition, the plaintiffs argued that the proposed burial constituted a violation of the environmental protection act, 1970 PA 127,[3] in that the burial would ultimately result in pollution of our state's groundwater supplies and that there was a feasible alternative to burial, namely incineration.

On April 17, 1978, the circuit court denied plaintiffs' request for a temporary restraining order. Plaintiffs filed an emergency application for leave to appeal in the Court of Appeals, which was denied on May 4, 1978, "for failure to persuade the Court of the need for immediate appellate review". Plaintiffs then filed in this Court an emergency application for leave to appeal and motion for immediate consideration on May 8, 1978. On the following day, this Court issued an order restraining defendants from burying the contaminated cattle. By order dated May 23, 1978, this Court remanded to the Oscoda Circuit Court for an evidentiary hearing with regard to the issues raised in plaintiffs' complaint and directed that the temporary restraining order remain in effect until further order of this Court. Nine days of hearing were had before the circuit court, terminating on June 16, 1978.

[2] MCL 325.291 *et seq.;* MSA 14.435(1) *et seq.*

[3] MCL 691.1201 *et seq.;* MSA 14.528(201) *et seq.*

On June 21, 1978, the circuit judge issued 17 pages of findings of fact and recommendations. The circuit court found that the clay-lined pit "provides absolute protection at the proposed burial site".[4] Accordingly, the circuit court recommended that the temporary restraining order be modified to permit the burial of contaminated cattle in the existing clay-lined pit for a period of six months. The circuit court further recommended that after such six-month period all PBB-contaminated cattle be incinerated.

On June 26, 1978, an order was entered by this Court directing plaintiffs to show cause why the temporary restraining order issued by this Court should not be dissolved and allowing defendants to respond.

We agree with Justice Levin that the issue before this Court is whether to grant plaintiffs' application for leave to appeal the denial of a temporary restraining order by the Oscoda County circuit judge. However, for reasons stated *infra,* we do not believe that it is necessary to discuss the alternative of incineration or the power of a court to order an alternative means of disposal.

We have examined the record of the hearing conducted by the circuit court and conclude that the circuit court's finding that the clay-lined pit "provides absolute protection at the proposed burial site" is substantially supported by the record and is not clearly erroneous.

Plaintiffs have failed to establish that the burial of the contaminated cattle in the clay-lined pit is likely to impair, pollute or destroy the environment, and thus have failed to meet their burden of

---

[4] Circuit court's opinion on remand, p 16.

proof under either § 3 or § 5 of the environmental protection act.[5]

Accordingly, we find that the circuit court did not abuse its discretion in declining to restrain defendants from burying the contaminated cattle in the clay-lined pit. Since plaintiffs have failed to meet the burden of proof required under the environmental protection act, we do not find that it is necessary to discuss the alleged desirability of incineration or the power of a court to decide which among the feasible alternatives would represent the least environmental risk.

The clerk is directed to enter and issue forthwith this Court's order dissolving the temporary restraining order, permitting the burial of contaminated cattle in the constructed clay-lined pit, and remanding to the circuit court for proceedings consistent with this opinion. A motion for rehearing may be filed but such filing does not stay execution or enforcement of this Court's order. GCR 1963, 866.3(c).

RYAN, J., concurred with FITZGERALD, J.

WILLIAMS and BLAIR MOODY, JR., JJ. *(dissenting)*. Protection of the health of Michigan citizens underlies the legal controversy in this case. The legal issue is how to dispose of PBB (polybrominated biphenyl) contaminated cattle within the framework of applicable Michigan statutes. The state seeks to bury the cattle in a clay-lined pit near Mio. Plaintiff citizens living near the pit contend that PBB would escape the pit, contaminate the water essential to their health and eco-

---

[5] MCL 691.1203; MSA 14.528(203) and MCL 691.1205; MSA 14.528(205).

nomic welfare, and eventually contaminate the Au Sable River and Lake Huron.

This Court ordered the case remanded to the Oscoda Circuit Court for an evidentiary hearing and detailed factual findings on the issues raised by the plaintiffs' complaint.[1] Thus, the trial court was presented with the total problem of disposal of PBB-contaminated cattle.

Among the issues raised, allegation No. 28 of the plaintiffs' complaint stated that, "there are prudent and feasible alternatives to the site in Oscoda County and the burial of the said PBB-contaminated cattle" and, specifically listed as one of those alternatives, "destruction of PBB through incineration". Furthermore, plaintiffs' complaint requested, as relief, that this Court "specifically declare that incineration is a feasible and prudent alternative to the PBB-contaminated cattle burial site in Oscoda County, Michigan". (Complaint, pp 15-16).

In response to this Court's order, the circuit court judge, the Honorable Allan C. Miller, ably conducted an exhaustive evidentiary hearing. On June 21, 1978, he issued 17 pages of findings of fact and recommendations covering all issues raised in the complaint. In conclusion, the judge recommended the following:

---

[1] "On order of the Court, the motion by appellants for immediate consideration of their application for leave to appeal is considered, and it is granted.

"A majority of the Court finding a need for development of a record, it is ordered, pursuant to GCR 853.2(4) in lieu of leave to appeal, that the case is remanded to the Oscoda Circuit Court for an evidentiary hearing and detailed factual findings on the issues raised by the plaintiffs' complaint. The hearing is to commence no later than 9:30 a.m., Tuesday, May 30, 1978 and to be concluded expeditiously, but no later than June 30, 1978. Testimony taken in Oscoda Circuit File No. 77-00-0600 CE is to be made a part of the record. The temporary restraining order previously issued is to remain in effect until further order of the Court. We retain jurisdiction."

"It is recommended that the temporary injunction be modified *pendente lite* to permit the burial of:

"1. The steel drums containing the carcasses;

"2. The condemned cattle now being held by the Department of Natural Resources, and

"3. Any other cattle condemned under Act 77 within the next six months; but restricted to the one pit now prepared;

"It is further recommended that after said six months all PBB contaminated cattle be incinerated." (Findings of Fact, p 17).

Therefore, after extensive hearings the trial court concluded that incineration was the preferred method for disposing of the PBB-contaminated cattle. However, due to the immediate need for disposal of these PBB-contaminated cattle and the time required to obtain an incineration system, the use of the clay-lined pit for six months was approved as the only available feasible alternative. Thereafter, the court found that all PBB-contaminated cattle should be incinerated.

After examining the record, including the expert testimony of both parties, we would adopt the findings of fact and recommendations of the Oscoda Circuit Court and remand for issuance of an order consistent with those findings and recommendations.

### RECORD SUPPORT FOR TRIAL COURT RECOMMENDATIONS

*I. PBB Can Be Destroyed by Incineration*

The circuit court found that "[i]ncineration is a preferred method of disposal whenever available". (Findings of Fact, p 9). The court made extensive findings, all of which are supported by the record, that incineration is feasible.

Mr. Eugene Crumpler, a chemical engineer with the United States Environmental Protection Agency (EPA) Hazardous Waste Management Division, Office of Solid Waste, was the EPA representative for the Federal government at the Rollins facility during the test burning of polychlorinated biphenyl (PCB). He stated, "From my own experience from what I have seen in the PCB work I think that PBB's can be destroyed under similar types of conditions that we have handled PCB's." (Transcript [hereafter Tr], p 1105).

Mr. Crumpler testified, "Most of the work that I'm familiar with, which I think has a bearing on this, is the PCB, polychlorinated biphenyl, destruction work that was done by our office. There is a great deal of chemical similarity between PBB's and PCB's as far as structure chemistry involved." (Tr, pp 1104-1105). Mr. Crumpler concluded that PBB could be destroyed under conditions similar to those used to destroy PCB.

Ms. Diane Carlson, a chemical engineer with the Michigan Department of Natural Resources (DNR) assigned to hazardous waste projects, was responsible for investigating for the state the possibility of incinerating PBB. When questioned about a DNR report compiled by her in October of 1977, recommending incineration as a feasible alternative, she testified, "I feel that incineration is still a feasible alternative at the proper combustion temperatures and retention time." (Tr, p 359).

Later in the testimony, Ms. Carlson reiterated that incineration is a feasible alternative:

"*Q. (Mr. Olson):* At this point if we were to design and engineer and try to construct and find a site for an incinerator, do you feel the specifications exist or can be developed to incinerate PBB cows to insure 100 percent destruction of the PBB?

"*A. (Ms. Carlson):* I think a unit can either be acquired or modified. Incineration is possible." (Tr, p 390).

Dr. Howard Tanner, Director of the DNR, testified as follows:

"I don't think there is any question that PBB can be destroyed by proper incineration. I never testified to that at all. I'm sure it can be destroyed. No question in my mind about it. It is under the circumstances that we are dealing with." (Tr, p 456).

## II. PBB By-Products Also Can Be Destroyed

Although the court found "[t]hat research on incineration of PBB has not resolved all of the problems connected with it," (Findings of Fact, p 9), the court concluded that those problems could be resolved:

"That while no tests have been conducted on a commercial scale with PBB, the experience with PCB at Rollins Environmental Service, Inc., facility, Deer Park, Texas (Exhibit 74) and the incineration at sea of Herbicide Orange (Exhibit 75) on the M/T Vulcanus indicate that all technical problems can be overcome." (Findings of Fact, p 9).

There was a concern that the destruction of PBB by incineration would produce noxious by-products. The court found that "noxious by-products known as furan and dioxin would be destroyed at these temperatures". (Findings of Fact, p 10). The phrase "these temperatures" refers to the temperatures necessary for the destruction of PBB.

Ms. Carlson also testified concerning the destruction of the dioxin:

"*Q. (Mr. Olson):*Nonetheless, at a high temperature of

let's say 2,000 degrees, the furan or dioxin would not be created because we would have—we wouldn't have the problem of—you know, if we meet all these four parameters we would not have the problem of low temperatures, incomplete combustion, et cetera?

"*A. (Ms. Carlson):* I would hope that would be the case and in addition we would be using a direct flame violent reaction incinerator as opposed to an oven that heats at a very slow rate and allows heat transfer. That can affect the products produced.

"*Q.* The oven is the slower rate?

"*A.* Yes. There may be sufficient loss of heat to allow rearrangement and formation of furans and dioxins in the ovens.

"*Q.* And whereas a sudden violent reaction at 2,000 degrees, that possibility becomes remote?

"*A.* Yes, that possibility becomes very low.

"*Q.* Theoretically impossible, at least in theory?

"*A.* I would say less probable.

"*Q.* Scientifically you would not expect it to occur?

"*A.* That's true." (Tr, p 362).

Mr. Crumpler explained the relevance of the Herbicide Orange incineration test:

"*Q. (Mr. Olson):* And in this project one of the aspects of it was it contained a dioxin in the Herbicide Orange before incineration even occurred?

"*A. (Mr. Crumpler):* That's correct. The entire stock was tested, and I will quote from the introduction and summary from this report on page one.

"*Q.* In fairness before we do that I have to introduce that document. But the purpose was to determine whether or not the dioxin was destroyed?

"*A.* This was the concern.

"*Q.* Was it destroyed?

"*A.* It was effectively destroyed." (Tr, pp 1122-1123, Exhibit 75—Herbicide Orange Incineration Test).

The danger of air pollution caused by incinera-

tion of PBB was considered by the court and resolved in the following manner:

"It has been determined that an incinerator capable of attaining a temperature of 2,000 degrees Fahrenheit with at least a two second retention; with adequate air induction facilities to draw emissions back into the kiln and a wet-scrubber and precipitator to eliminate escape of noxious fumes or by-products, can accomplish the destruction of PBB and noxious by-products." (Findings of Fact, p 10).

Ms. Carlson testified to the conditions necessary to destroy PBB. At one point she identified Exhibit 42 as a request by the DNR in October of 1977 for bids on specifications for an incinerator. (Tr, pp 364-365). The specifications indicate that in October of 1977, the DNR believed technology was available to safely incinerate PBB-contaminated cattle.

Although detailed testimony was presented on the chemical reactions and physical problems which would be involved in the incineration of PBB, all witnesses questioned about incineration, both for the plaintiff and defendant, agreed that incineration was feasible.

Furthermore, the court found specifically that:

"4. The Federal Environmental Protection Agency (Guideline Draft 3004) order of options is as follows:
"a) Recycling if possible,
"b) Incineration if possible,
"c) Landfill, and
"d) Long term storage." (Findings of Fact, p 9).

These guidelines were given additional validity when Mr. Crumpler of the EPA testified that there is a proposed change in the EPA guidelines under

consideration "which says that if a waste can be incinerated it shall not be landfill". (Tr, p 1132).

Based on this analysis of the record, we would agree with the lower court's finding that incineration of PBB is feasible and the "preferred method of disposal whenever available".

## III. Availability of Incineration Facilities

The court found:

"3. There is no 'on shelf' or existing incinerator in Michigan available to the State at this time, however:

"a) Exhibits 16 and 17 indicate that a new incinerator could have been operating by April, 1978 (Tanner, Tr, p 460).

"b) Cost would be comparable and,

"c) Site location problems would exist as to either burial or incineration." (Findings of Fact, p 10).[2]

The court concluded:

"That while an incinerator is needed for disposal of toxic wastes generally, and would be desirable for the resolution of the instant problem (and while such facilities are a priority item of the Department of Natural Resources, Exhibit 46 during the current legislation term) the facility is not a current reality." (Findings of Fact, p 9).

This conclusion was based on the testimony of Dr. Tanner to the effect that toxic hazardous substances disposal was number one on the DNR priority list currently before the Legislature. (Tr, p 452). He testified that, "The Department has a request before the legislature now for a facility of

[2] Exhibits 16 and 17 are DNR internal reports prepared in October, 1977, containing specifications and cost estimates on the feasibility of incineration.

substantial capability and complexity including incineration." (Tr, p 450).

Furthermore, the court found:

"That even after an order was placed it would take four months for set-up and an equivalent period of time for adequate testing before operations could proceed. (Exhibit 16, 17, 42 and 48.)" (Findings of Fact, p 9).[3]

Accordingly, while there is at the present time no incinerator in Michigan available to the state for destruction of PBB-contaminated cattle, the trial court found that a new incinerator could have been operational in April of 1978, three months ago. Within a comparable time frame, such a unit could be developed for future use to destroy PBB-contaminated cattle.[4]

## IV. Exigent Circumstances Require Temporary Use of Pit

The key factor in understanding the trial judge's recommendations is the state's argument that immediate disposal of the dead animals is required. The state's position is reflected thus:

"At the close of the record, the state held 1,039 animals, of which 200 to 300 were dead cows stored in barrels in freezers rented by the state. The cold storage of dead animals may not be an option much longer, however, as space is limited, the freezer companies will not accept decaying cows for fear of contamination of other perishables, and because the time period covered by the leases is ending. Also, the cold storage facilities

---

[3] Exhibits 42 and 48 are also internal reports of the DNR.

[4] The total number of condemned cattle will eventually exceed the capacity of the existing clay-lined pit in Oscoda County. (Testimony of Mr. Fred B. Kellow, Chief of the Division of Resource Recovery, DNR, Tr, pp 516-518, 532).

will soon be needed for storage of harvested fruit and vegetables which will be soon arriving.

"Clearly, if the Oscoda site could be used for burial of the cows, PBB contaminated cows dying on the state farms could immediately be transported for disposition at the site. Without the site, the only clear alternative will be to cease accepting cows under the act, or to dispose of the cows in an unsafe manner where risks to the environment would result. (Turney, Tr, pp 298-300; Tanner, Tr, pp 483-486, 498-501; and Kellow, Tr, pp 544-545).

"Another potential risk resulting from delay in this matter is that burial at the Oscoda site may be hindered if the winter season approaches. The site design calls for installation of clay over the top of the burial area. Transportation of clay, and compaction of the top layer over buried animals cannot be undertaken in freezing weather. Thus a decision should be reached soon to provide for proper disposition of the animals in accordance with the present site design. (Tr, pp 983-985)." (Brief of Attorney General, pp 29-30).

The trial judge accepted this immediacy argument in his findings of fact:

"That since the cold storage facilities are needed by the owners for storage of current harvests of fruits and vegetables, immediate disposal of these 'canned cows' is necessary." (Findings of Fact, p 15).

Therefore, it seems clear that the trial judge's recommendation of burial in the present pit for six months is based upon two considerations:

1. The rapid decay of contaminated cattle during the hot summer months coupled with a lack of available freezer space, and

2. The fact that the present clay-lined pit is the only feasible and prudent alternative currently available.

INTERPRETATION AND APPLICATION OF THE
MICHIGAN ENVIRONMENTAL PROTECTION ACT

## I. Background

In *Ray v Mason County Drain Commissioner,*
393 Mich 294; 224 NW2d 883 (1975), this Court
examined in detail the powers granted to courts by
the Legislature under the Michigan environmental
protection act (MEPA), MCL 691.1201 *et seq.; MSA*
14.528(201) *et seq.* Among the powers granted to
courts by the MEPA:

"The court may grant temporary and permanent
equitable relief, *or may impose conditions* on the de-
fendant that are required to protect the air, water and
other natural resources or the public trust therein from
pollution, impairment or destruction." MCL 691.1204(1);
MSA 14.528(204)(1). (Emphasis added.)

The *Ray* opinion stated without dissent:

"[T]he EPA does more than give standing to the
public and grant equitable powers to the circuit courts,
it also imposes a duty on individuals and organizations
both in the public and private sectors to prevent or
minimize degradation of the environment which is
caused or is likely to be caused by their activities. *The
EPA prohibits pollution, destruction, or impairment of
the environment unless it can be shown that 'there is
no feasible and prudent alternative'* and that defend-
ant's conduct 'is consistent with the promotion of public
health, safety and welfare in light of the state's para-
mount concern for the protection of its natural re-
sources * * * '. MCL 691.1203; MSA 14.528(203).
"The Legislature in establishing environmental rights
set the parameters for the standard of environmental
quality but did not attempt to set forth an elaborate
scheme of detailed provisions designed to cover every
conceivable type of environmental pollution or impair-
ment. Rather the Legislature spoke as precisely as the

subject matter permits and in its wisdom left to the courts the important task of giving substance to the standard by developing a common law of environmental quality. *The act allows the courts to fashion standards in the context of actual problems as they arise in individual cases and to take into consideration changes in technology which the Legislature at the time of the act's passage could not hope to foresee.*" Ray, *supra*, 306-307. (Emphasis added.)

Therefore, it is clear that courts would be ignoring the mandate of the Legislature were they to refuse to grant equitable relief or impose conditions required to protect the air, water and natural resources.

## II. Prima Facie Case Established

The court's power to "fashion standards in the context of actual problems" and to grant appropriate relief is triggered by "a prima facie showing that the conduct of the defendant has, or is likely to pollute, impair or destroy the air, water or other natural resources". MCL 691.1203(1); MSA 14.528(203)(1). A prima facie case is one which "will suffice until contradicted and overcome by other evidence". Black's Law Dictionary (4th ed), p 1353. Thus, plaintiffs need only present facts necessary to sustain a prima facie showing, which the court may or may not adopt after considering the response of defendants.

The plaintiffs made a prima facie showing that the pit lined with 20 feet of clay was "likely to pollute, or impair the environment". Dr. Donald Gray, Professor of Engineering at the University of Michigan, whose credentials include a Ph.D. dissertation on fluid flows in compacted clay at the University of California, Berkley, testified that:

(1) the type of clay used in the liner is not the most

suitable type for purposes of constructing a practically impermeable liner (Tr, p 852);

(2) the most suitable method of compaction was not performed (Tr, pp 852, 882-883);

(3) the liner may be constructed of clay which is not completely homogeneous (Tr, pp 859-860, 864);

(4) since the completion of the sides on or about May 22, 1978, the liner has not been protected to prevent any further drying of the surface (and the subsurface areas by capillary [wick] action), thus aggravating the susceptibility of the liner to cracks and fissures (Tr, pp 852, 863, 868);

(5) in spite of the existence of such testing procedures, defendants have never done a permeability test of the clay liner after construction (Tr, pp 861-862, 867).

Dr. Robert Asperger, a chemist at Dow Chemical, testified that:

To the extent that PBB is water soluble it will not be completely contained in the organic material; moreover, the PBB contained in the organic material will be washed from the material by water percolating through it over time and will ultimately reach the water table (Tr, p 1469); and (Exhibit 94 which establishes solubility of PBB in water). And, solubility is increased because of the hydrolizing phenomena of the fat molecule to water (Tr, p 1474).

The testimony of Drs. Gray and Asperger set forth plaintiffs' prima facie showing that defendant's conduct was likely to pollute the environment. Plaintiffs met the threshold requirement, accordingly, judicial intervention in the public interest was mandated under the MEPA.

### III. Affirmative Defense

Section 3 of the MEPA provides:

"When the plaintiff in the action has made a prima facie showing that the conduct of the defendant has, or is likely to pollute, impair or destroy the air, water or other natural resources or the public trust therein, *the*

*defendant may rebut the prima facie showing by the submission of evidence to the contrary. The defendant may also show, by way of an affirmative defense, that there is no feasible and prudent alternative to defendant's conduct and that such conduct is consistent with the promotion of the public health, safety and welfare* in light of the state's paramount concern for the protection of its natural resources from pollution, impairment or destruction." MCL 691.1203(1); MSA 14.528(203)(1). (Emphasis added.)

Thus, once plaintiffs established their prima facie case, the defendant DNR had but two courses of action:

1. Rebut the prima facie showing that defendant's conduct has or is likely to pollute, and/or

2. Establish as an affirmative defense that there is no feasible and prudent alternative to defendant's conduct and that such conduct is consistent with the promotion of public health, safety and welfare.

We cannot accept the suggestion of Justice LEVIN that since the defendant "DNR did not seek to show by way of affirmative defense that there was no feasible and prudent alternative, the court was without power to adjudicate the question". Perhaps the DNR did not label its action as a showing of an affirmative defense, nevertheless, the DNR simultaneously sought to prove three claims:

1. Burial in the clay-lined pit was not likely to pollute;

2. Prompt action was necessary to dispose of dying PBB-contaminated cattle and "canned cows" stored under leases about to expire; and

3. Incineration facilities were not presently available nor could be available to the state for a period of months.

In other words, while the DNR offered proofs to rebut plaintiffs' prima facie case, it also attempted to prove as an affirmative defense that there was no feasible and prudent alternative available other than the clay-lined pit. Furthermore, defendant urged that making no immediate effort to dispose of the PBB-contaminated cattle was the worst possible alternative.

The trial court, therefore, determined whether plaintiffs' prima facie case was successfully rebutted by the defendants. Judge Miller's opinion illustrates that defendants did not completely rebut plaintiffs' case, but only proved that the present clay-lined pit was the only alternative currently available.

The broad sweep of the MEPA, placing power with the courts to respond on behalf of the public welfare, does not correspond with the narrow, restrictive interpretation of Justice Levin's opinion. No provision in the MEPA gives substance to the assertion that feasible and prudent alternatives consistent with public welfare may not be considered by a court of equity unless the alleged polluter raises an affirmative defense. If defendants could avoid the court's scrutiny of alternatives by merely failing to formally plead an affirmative defense, the MEPA would be effectively gutted of its intended purpose of protecting the environment.

Furthermore, the MEPA contains a positive requirement that judicial decisions reflect broad consideration of environmental factors. Section 5 of the act provides in part:

"In any such administrative, licensing or other proceedings, and in any judicial review thereof, *any alleged pollution, impairment or destruction* of the air, water or other natural resources or the public trust therein,

*shall be determined, and no conduct shall be authorized
or approved which does, or is likely to have such effect
so long as there is a feasible and prudent alternative
consistent with the reasonable requirements of the
public health, safety and welfare."* MCL 691.1205(2);
MSA 14.528(205)(2). (Emphasis added.)

In addition, § 4 states:

"Upon completion of such proceedings, *the court shall
adjudicate the impact of the defendant's conduct on the
air, water or other natural resources and on the public
trust therein in accordance with this act.* In such adju-
dication the court may order that additional evidence
be taken to the extent necessary to protect the rights
recognized in this act." MCL 691.1204(3); MSA
14.528(204)(3). (Emphasis added.)

These sections read together clearly set forth the
courts' role in environmental cases. The court
must fully assess the impact of defendant's con-
duct and shall not authorize any conduct which
pollutes or is likely to pollute the environment so
long as a feasible and prudent alternative exists
consistent with the public welfare.

*IV. Adoption of Alternative Least Likely to Impair
or Pollute*

The appropriate criterion under the Michigan
environmental protection act (MEPA) is to adopt
the feasible and prudent alternative *least likely* to
impair or pollute the environment. The Michigan
Constitution declares that it is the paramount
policy of this state to preserve and protect the
environment. Const 1963, art 4, § 52. The impor-
tance of this policy is reiterated in the MEPA.
MCL 691.1201 *et seq.;* MSA 14.528(201) *et seq.*

While the act does not specifically speak to

selecting between feasible and prudent alternatives, the paramount purpose of the act, preservation and protection of the environment, requires adoption of the feasible and prudent alternative *least likely* to impair or pollute. Furthermore, rapid technological advancements require courts to use foresight when attempting to minimize adverse effects on the environment. See *Ray, supra,* 306-307.

The MEPA was carefully drafted. Before its adoption, MEPA opponents proposed an amendment to change the "and" to "or" in § 3(1) thereby giving the defendant the option of showing either that no feasible and prudent alternative to his conduct exists or that defendant's proposed conduct is consistent with the promotion of the public health. Watts, *Michigan Environmental Protection Act: Political Background,* 4 J L Reform 358, 366-367 (1970).

This amendment was rejected. Accordingly, the MEPA gives courts authority to find that certain activities, although feasible and prudent, are not consistent with the promotion of the public health. Clearly, when presented with a selection of alternatives, courts have a duty to evaluate not only whether an alternative is feasible and prudent but also whether such alternative is consistent with the public welfare.

Therefore, we cannot accept Justice LEVIN's conclusion that it is not within the power of the courts to decide which among several feasible alternatives a defendant should adopt.

This conclusion also ignores the language of § 2:

"(2) In granting relief provided by subsection (1) where there is involved a standard for pollution or for an anti-pollution device or procedure, fixed by rule or

otherwise, by an instrumentality or agency of the state or a political subdivision thereof, the court may:

"(a) Determine the validity, applicability and reasonableness of the standard.

"(b) When a court finds a standard to be deficient, direct the adoption of a standard approved and specified by the court." MCL 691.1202(2); MSA 14.528(202(2).

This section grants courts the authority to examine standards set by state agencies and to require the adoption of standards which do not endanger the environment. The analogous power of courts to examine the alternatives available to state agencies is implicit. Professor Joseph Sax, recognized as the national authority on environmental law, noted about the MEPA:

"Section 2 seems to have created the impression in some quarters that the courts are empowered, because of the EPA, to re-examine legislatively set standards and to repeal and replace those found to be deficient. Clearly, the section has no such purpose. Section 2 is not directed to standards fixed by the legislature, but to those set by regulatory agencies and political subdivisions. If the legislature sets a specific standard that is inconsistent with the EPA, the courts must comply with that standard. The EPA, after all, is not a constitution.

"At the same time, the EPA itself does set an environmental policy; and for the courts to implement that policy—against an agency's rule or regulation—is not to usurp legislative prerogatives, but to enforce them. *Although its provisions are phrased in broad terms, the EPA is nonetheless a statute, superior to the explicit decisions and rules of regulatory agencies and local governments."* Sax & Conner, *Michigan's Environmental Protection Act of 1970: A Progress Report,* 70 Mich L Rev 1003, 1065 (1972). (Emphasis added.)

The Legislature in enacting the PBB act, MCL 288.421 *et seq.;* MSA 12.695(1) *et seq.,* did not

mandate the method for disposal of PBB but instead authorized the DNR to evaluate the alternatives of "burial or disposal". The DNR's decision to bury rather than incinerate is subject to the expanded judicial review set forth in the MEPA. The amplified role of the court was commented upon by Professor Sax:

"Beyond giving private citizens the right to initiate or participate in environmental proceedings, the EPA is a significant departure in another way. It enlarges the role of courts because it permits a plaintiff to assert that his right to environmental quality has been violated in much the same way that one has always been able to claim that a property or contract right has been violated. In taking this step, the legislature reduced the broad discretion that regulatory agencies formerly had. Previously these agencies had been given a sweeping mandate to enforce environmental standards as they thought best, and their decisions were subject to judicial review only for arbitrary and abusive use of their authority or for violation of explicit statutory language. Now these agencies must be prepared to defend themselves against charges that their decisions fail to protect natural resources from pollution, impairment, or destruction." *Sax, supra,* p 1005.

## V. Trial Court's Application of the MEPA

Judge Miller found that the pit, as modified with a clay liner, *could be* a feasible and prudent alternative:

"That as modified with a clay liner it *could be* a feasible and prudent alternative." (Finding of Fact, p 9.) (Emphasis added.)

Subsequently, in his findings of fact the trial judge stated:

Dissenting Opinion by Williams and Blair Moody, Jr., JJ.

"The court authorized 20 feet of clay based upon Michigan Solid Waste regulations, (Exhibit 7, p 4, #5 of the September 22, 1977 hearing), provides absolute protection at the proposed burial site.\*"

---

"\* The Michigan solid waste disposal regulation provides in part as follows:
" '5. Where possible, landfills should be placed in earth materials of low permeability (less than 0.2 inches per hour) such as glacial clay till or lake clay. In these materials, a continuous thickness of at least 20 feet of the material should exist between the base of the refuse and the groundwater aquifer. This thickness is needed for protection of groundwater quality.' "

---

(Findings of Fact, p 16).

The presently constructed pit provides absolute protection within the context of the Michigan solid waste disposal regulations promulgated under the garbage and refuse disposal act. MCL 325.291 *et seq.;* MSA 14.435(1) *et seq.* The Michigan solid waste disposal regulations are not specifically directed toward disposal of toxic material. At the present time, Michigan does not have any specific statutes regulating hazardous waste disposal.[5]

Therefore, in recommending after the six-month period all contaminated cattle be incinerated, the trial court recognized, in the interest of the good health of Michigan citizens, that the state should be required to adopt the feasible and prudent alternative least likely to impair or pollute consistent with the public welfare, *i.e., incineration.* This preferred alternative would then become feasible; the state would have the opportunity to obtain all incineration equipment and run the proper test burns to accurately determine all factors necessary to safely and ecologically destroy the PBB substance contained in the contaminated cattle.

The advantage of incineration is easily dis-

[5] Hazardous waste legislation is pending before both the Senate and the House. SB 1242 and HB 5711.

cerned: incineration can totally destroy the toxic substance; burial can only attempt to contain it within a limited area.

## CONCLUSION

Based upon this analysis of the lack of an available incinerator and the immediacy of the current situation, we would adopt in full the recommendations of the trial court allowing burial in the now existing clay-lined pit for the limited period of six months, after which time all PBB-contaminated cattle should be incinerated. We would remand to the Oscoda Circuit Court for entry of an order reflecting these recommendations. This would enable the trial judge to retain jurisdiction and take any further action he deems necessary to enforce and, if circumstances require, modify said order. Upon entry by the trial judge of the order hereinbefore mentioned, we would dissolve the temporary restraining order previously issued by this Court.